UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BAPTIST HEALTHCARE SYSTEM d/b/a      )
BAPTIST REGIONAL MEDICAL CENTER,     )
                                 )
     Plaintiff,              )
                                 )   Case No. 1:08-cv-00677 (RJL)
     v.                     )
                                 )
CHARLES E. JOHNSON, Secretary of the )
United States Department of Health and )
Human Services[1],                   )
                                 )
     Defendant.             )
                                 )

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(b), Defendant Charles E. Johnson,

Secretary of Health and Human Services, by and through his undersigned counsel, respectfully

moves this Court for summary judgment on the grounds that there are no material facts in dispute

and that Defendant is entitled to judgment as a matter of law. In support of the instant motion, the

Court is respectfully referred to the accompanying Memorandum of Points and Authorities in

Support of Defendant's Cross-Motion for Summary Judgment and in Opposition to Plaintiff's

Motion for Summary Judgment.[2]  A proposed order is also attached.

---

[1]  On January 20, 2009, Charles E. Johnson became the Acting Secretary of the United
States Department of Health and Human Services, and should therefore be substituted for the
former Secretary, Michael O. Leavitt, as the Defendant in this action. Fed. R. Civ. P. 25(d).

[2]  Defendant notes that plaintiff filed a *Statement of Material Facts As to Which There Is
No Genuine Issue* (Docket #15), but pursuant to Local Rule LCvR 7(h) (amended Sept. 2, 2008),
in cases based on an administrative record, as here, the requirement to file such a statement of
material facts is inapplicable.  Accordingly, defendant will not file its own Rule 7(h) statement,
or provide a separate response to plaintiff's statement, but instead sets forth the relevant facts in
the accompanying Memorandum of Points and Authorities.

Respectfully submitted,

/s/
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

/s/
JEREMY S. SIMON
Assistant United States Attorney
D.C. Bar No. 447956
Judiciary Center Building
555 4th St., N.W.
Washington, D.C. 20530
(202) 307-0406 (phone)
(202) 514-8780 (fax)

/s/
ANDREW S.M. TSUI
U.S. Department of Health and Human
Services
Office of the General Counsel
Centers for Medicare & Medicaid Services
Division
Room C2-02-24
7500 Security Boulevard
Baltimore, Maryland 21244-1850
(410) 786-1895

OF COUNSEL:

DAVID S. CADE
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation
United States Department of
Health and Human Services

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| BAPTIST HEALTHCARE SYSTEM d/b/a<br>BAPTIST REGIONAL MEDICAL CENTER,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES E. JOHNSON, Secretary of the<br>United States Department of Health and<br>Human Services,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:08-cv-00677 (RJL) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
CROSS MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Baptist Regional Medical Center ("Plaintiff" or "BRMC"), a Medicare-participating acute

care hospital, has filed this action to obtain judicial review of a decision of the Secretary of the

United States Department of Health and Human Services ("Defendant" or "Secretary"). Plaintiff

complains it is entitled to additional Medicare reimbursement amounts attributable to the care of

indigent Medicare patients.

Specifically, plaintiff's action challenges the Secretary's interpretation of a regulation as

applied to the reimbursement of Medicare "bad debt." "Bad debt," of course, is a financial term

relating to unpaid sums of money for healthcare services rendered. Left unmitigated, "bad debt"

becomes an expense which may ultimately be "written off" as a loss to the hospital. Generally,

the Medicare program will reimburse hospitals for "bad debt" such as unpaid Medicare

1

coinsurance and deductible amounts on the condition that providers undertake "reasonable collection efforts" to recover unpaid sums.  Where a Medicare beneficiary is deemed indigent, however, a hospital may seek reimbursement for such bad debt without undertaking typical reasonable collection efforts.  In order to determine indigent status, the Secretary's rules governing payment for bad debts state that before a hospital may declare a beneficiary to be "indigent," it must perform an analysis of the beneficiary's assets.  Plaintiff here performed no such asset test as to the bad debts it now seeks reimbursement for, and thus could not be excused from attempting to collect those debts via reasonable collection efforts.  Because plaintiff neither properly deemed the patients at issue indigent nor exerted reasonable efforts to collect the debts owing, the Secretary reasonably denied plaintiff's request for additional reimbursement.

## STATUTORY AND REGULATORY BACKGROUND

### I.    The Medicare Program Generally

Medicare is a program of health insurance primarily providing medical benefits for persons who are over sixty-five years of age and who are eligible for Social Security retirement benefits, and to individuals under sixty-five who have received Social Security disability benefits for at least two years.  42 U.S.C. § 1395c.  Medicare Part A, the part of Medicare at issue here, makes payments to hospitals for inpatient care furnished to program beneficiaries, among other things.  *See* 42 U.S.C. §§ 1395c–1395i-5.  Responsibility for determining the amount of Medicare payments has been entrusted by Congress to the Secretary, who has delegated most of the day-to-day administration of the program to the Centers for Medicare & Medicaid Services ("CMS").  During the periods at issue here, CMS, in turn, engaged contractors, known as "fiscal intermediaries" (or "intermediaries"), to process hospital claims.  42 U.S.C. § 1395h (2001).

2

Medicare, however, does not generally fully pay for covered health care services. Thus, a patient remains responsible for paying various deductibles and coinsurance amounts. 42 U.S.C. § 1395e.

## II.   **Medicare Payments to Hospitals**

The Medicare statute originally provided for reimbursement of the "reasonable cost" of hospital inpatient services furnished to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A). "Reasonable cost" is defined in the statute as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services" to beneficiaries. *Id.* The statute also directs the Secretary to promulgate regulations "establishing the method or methods to be used" for determining "reasonable cost[s]." *Id.* In prescribing such regulations, Medicare requires the Secretary to ensure that provider reimbursement  be related to beneficiary care, so that the "necessary costs of efficiently delivering covered services to [Medicare beneficiaries] . . . will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [the Medicare program]." 42 U.S.C. § 1395x(v)(1)(A)(i). This provision thus prohibits shifting the costs of Medicare services to non-beneficiaries.

For cost reporting periods after April 1, 1983, however, Congress directed that reimbursement for inpatient hospital operating costs be made under the Prospective Payment System ("PPS"). Under PPS, a hospital is paid for each discharge a pre-determined payment rate based on the diagnostic classification assigned to that discharge. *See Washington Hosp. Ctr. v. Bowen,* 795 F.2d 139 (D.C. Cir. 1986); 42 U.S.C. § 1395ww(d); 42 C.F.R. §§ 412.1 *et seq.* A limited number of hospital costs other than inpatient operating costs continue to be reimbursed

3

under the "reasonable cost methodology" that was in place prior to the implementation of PPS. The uncollected Medicare deductible and coinsurance amounts at issue in this case are among the few items that continue to be separately reimbursed on a "reasonable cost basis" (or "passed through") under PPS.  42 C.F.R. § 412.4(f)(4).

**III.   Bad Debt Reimbursement Under the Medicare Regulations**

Pursuant to his grant of authority, the Secretary has promulgated regulations establishing "principles of reasonable cost reimbursement." 42 C.F.R. Pt. 413.  As is pertinent in this case, the Medicare payment regulations generally treat uncollectible hospital charges ("bad debts") as deductions from revenue that are not actual costs incurred in the delivery of medical services. *Id.* at § 413.89(a), (c).[3]  However, the "failure of beneficiaries to pay the deductible and coinsurance amounts could result in the related costs of covered services being borne by other than Medicare beneficiaries." *Id.* at § 413.89(d).  Thus, consistent with the Act's prohibition against shifting the costs of Medicare services to non-beneficiaries, the regulations provide that "the costs attributable to the deductible and coinsurance amounts that remain unpaid [by Medicare beneficiaries] are added to the Medicare share of allowable costs." 42 C.F.R.§ 413.89(d).  *See also* 42 U.S.C. § 1395x(v)(1)(A)(i).  A bad debt must satisfy the following criteria:

(1)   The debt must be related to covered services and derived from deductible and coinsurance amounts.
(2)   The provider *must be able to establish that reasonable collection efforts were made*.
(3)   The debt was actually uncollectible when claimed as worthless.
(4)   Sound business judgment established that there was no likelihood of recovery at any time in the future.

---

[3] Formerly set forth at 42 C.F.R. § 413.80, re-designated without substantive change August 11, 2004.

42 C.F.R. § 413.89(e) (emphasis added).

To assist intermediaries and health care providers in applying these principles to specific cases, the Secretary has issued an extensive, detailed set of interpretive rules in the form of guidelines, manuals, letters and other publications, including CMS Pub. 15-1 ("Provider Reimbursement Manual" or "PRM" or, "Manual"). With respect to bad debts, PRM § 310 states:

> To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients. It must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations. It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party which constitute a genuine, rather than token collection effort.

PRM § 310.[4]  Moreover, Section 310.B states that the provider's collection effort is to be documented "in the patients file by copies of the bill(s) . . . ."

In the case of indigent patients, the manual directs providers to adhere to the reasonable collection efforts in a different way.  Specifically, the manual deems the reasonable collection efforts requirement to be satisfied where the beneficiary's indigence is established by the provider under the following criteria:

> 312.   INDIGENT OR MEDICALLY INDIGENT PATIENTS
> In some cases, the provider may have established before discharge, or within a reasonable time before the current admission, that the beneficiary is either indigent or medically indigent.  Providers can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy

---

[4] *Available at*
http://www.cms.hhs.gov/Manuals/PBM/itemdetail.asp?filterType=none&filterByDID=-99&sort ByDID=1&sortOrder=ascending&itemID=CMS021929.

individuals, respectively. Otherwise, the provider should apply its customary methods for determining indigence of patients to the case of the Medicare beneficiary under the following guidelines:

A. The patient's indigence must be determined by the provider, not by the patient; i.e., a patient's signed declaration of his inability to pay his medical bills cannot be considered proof of indigency;

B. The provider should take into account a patient's total resources which would include, but are not limited to, an analysis of assets (only those convertible to cash, and unnecessary for the patient's daily living), liabilities, and income and expenses . . .;

C. The provider must determine that no source other than the patient would be legally responsible for the patient's medical bill . . .; and

D. The patient's file should contain documentation of the method by which indigence was determined in addition to all backup information to substantiate the determination.

Once indigence is determined and the provider concludes that there has been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the § 310 procedures . . . .

PRM § 312[5]. These provisions of the PRM have not been amended since 1983. *See also* 1 Medicare & Medicaid Guide (CCH) ¶ 5239 (1993).

## IV. Hospital Cost Reporting and Appeals

The efficient operation of the Medicare program requires that health care providers, including Medicare participating hospitals such as plaintiff, submit complete claims for reimbursement. Hospitals that receive Part A payments are required to submit annual cost reports to their designated fiscal intermediary. *See* 42 C.F.R. § 413.20-413.24. To permit efficient processing of these voluminous reports, the Medicare regulations require health care providers to "furnish such information to the intermediary as may be necessary" to "[a]ssure proper payment by the program." 42 C.F.R. § 413.20(d)(1)(I). This includes *all* "cost revenue,

---

[5] *Available at*
http://www.cms.hhs.gov/Manuals/PBM/itemdetail.asp?filterType=none&filterByDID=-99&sortByDID=1&sortOrder=ascending&itemID=CMS021929.

statistical, and other information pertinent to reimbursement." 42 C.F.R. § 413.20(c)(2).[6] The

intermediary reviews the cost report and determines the provider's reimbursable reasonable costs

for services furnished during the period covered by the report. 42 C.F.R. § 413.20(b). The

provider is notified of the intermediary's determination in a written notice of program

reimbursement ("NPR"). 42 C.F.R. § 405.1803.

If the provider is dissatisfied with the intermediary's reimbursement determination, it may

appeal that determination to the Provider Reimbursement Review Board ("PRRB" or "Board").

*See* 42 U.S.C. § 1395oo(a); 42 C.F.R. §§ 405.1835(a), 405.1841(a). The decision of the PRRB is

final unless the Secretary, on his own motion, reverses, affirms, or modifies the Board's decision.

*Id.* at § 1395oo(f)(1). The Secretary has delegated his review authority to the Administrator of

CMS, whose decision on review constitutes the final decision of the Secretary. 42 C.F.R.

§ 405.1875. A hospital may thereafter seek judicial review of the agency's final decision in

district court. *Id.* Such review is conducted in accordance with the provisions of the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. *See* 42 U.S.C. § 1395oo(f)(1).

## FACTS

Plaintiff BRMC is a voluntary nonprofit short-term hospital doing business in Corbin,

Kentucky. Administrative Record ("A.R.") at 2. Plaintiff participates in the Medicare program

established under Title XVIII of the Social Security Act as a provider of hospital services.

---

[6] *See also* 42 C.F.R. § 413.24(c) (provider must furnish "cost information" that is "[a]dequate" to "support payments made for services furnished to beneficiaries"), § 413.20(a) (provider required to "maintain sufficient financial records and statistical data for proper determination of costs payable under the program" and must use "reporting practices that are widely accepted in the hospital and related fields"), § 413.20(c)(1) (provider must have an "adequate ongoing system for furnishing the records needed to provide accurate cost data and other information capable of verification by qualified auditors").

Plaintiff's Complaint ("Compl.") ¶ 1; Defendant's Answer ("Ans.") ¶ 1.  For the time period of

the hospital cost reporting periods at issue, the fiscal intermediary for the plaintiff in this case

was AdminaStar Federal, Inc. (the "Intermediary").[7]  Compl. ¶ 4; Ans. ¶ 4.

Plaintiff offers inpatient/outpatient, psychiatric, and rehabilitation services, and has

crafted its own charitable care policy to apply as needed to its patients.  *See* A.R. at 2.  As part of

plaintiff's collection and write-off policy to determine indigence, where a patient's account had a

balance due of less than $800, the policy required only that a patient verbally disclose

information regarding his income.  *Id.*; *see also* A.R. at 60.  If the patient was determined to be

indigent, the patient would then receive full charity care if the patient's income was less than

125% of the federal poverty level.  *Id.* at 2-3.  Where a patient's account had a balance due of

$800 or more, the policy required patients to disclose information regarding both income and

assets, and the plaintiff determined the amount of debt forgiveness based on both.  *Id.*

During the audit of the plaintiff's 1999, 2000, and 2001 cost reports, the Intermediary

determined that the plaintiff's bad debt write-off practices were inconsistent with the

requirements of PRM § 312, under which determinations of indigence must include

consideration of the patients' total resources (i.e., assets, liabilities and income and expenses).

Accordingly, the Intermediary disallowed all bad debt claims for which the BRMC's records did

not evidence the performance of an asset test.  The Intermediary stated that in the case of patient

accounts less than $800, the plaintiff performed no review of patient assets as part of the

plaintiff's indigence determination.  A.R. at 3, 308-16, 440-46.  In addition, even in the case of

---

[7]  AdminaStar Federal, Inc. changed its name to National Government Services, Inc., effective January 1, 2007.

patient accounts over $800, there were instances in which the plaintiff performed no review of

patient assets as part of the plaintiff's indigence determination, and the Intermediary disallowed

payment for those debts also. *Id.* The adjustments were *consistently* based on a determination

that in cases of indigency, plaintiff had failed to perform and/or document an asset test as

necessary to conduct "reasonable collection efforts" under the Secretary's regulations at 42

C.F.R. § 413.80(e) and PRM § 312.[8] Thus, the Intermediary did *not* authorize payment for any of

the indigency accounts lacking an asset test, regardless of whether the account balance was over

or under $800 (A.R. at 62), and plaintiff does not contest any of the disallowances regarding

accounts over $800. *Id.* at 84-85. The only issue presented here, therefore, is whether plaintiff

performed and/or documented an asset test for accounts with balances under $800.

   Plaintiff appealed the Intermediary's adjustment to the PRRB, which heard the appeal on

June 20, 2007. Compl. ¶ 21; Ans. ¶ 21; A.R. 27-34. On December 10, 2007, the Board rendered

its decision, reversing the Intermediary's disallowances. A.R. 27-34. On February 8, 2008, The

Deputy Administrator of CMS ("Administrator") reversed the Board's decision. Compl. ¶ 25;

Plaintiff's Motion for Summary Judgment ("Pl.'s Mot. Summ. J.") at 6; A.R. 2-11. After setting

out the factual background of the case, summarizing the Board's decision, and acknowledging

the parties' comments regarding that decision, the Administrator explained that:

> The Secretary has consistently interpreted manual provisions as requiring
> providers to comply with all terms in order to receive reimbursement for Medicare
> bad debt and has issued subsequent interpretive materials that take this position . .
> . If the Secretary were to excuse providers from attempting to collect debts

---

   [8] Defendant points out that plaintiff's $800 threshold amount is a dollar amount without
basis in the Medicare statute or any rules or regulations thereto, including the PRM. Rather, the
$800 threshold amount was determined at plaintiff's sole discretion, presumably as part of its
self-styled charitable care policy.

because such attempts would be futile due to indigency, as provided under § 312, then it is only reasonable to require – except in the cases of governmental determinations of Medicaid eligibility – that the provider follow prescribed criteria for verifying indigency and document those procedures in accordance with Medicare documentation rules.

A.R. 8-9. The Administrator's decision is the final decision of the Secretary in this matter. The plaintiff has timely sought judicial review of the decision and has now filed a motion for summary judgment seeking to reverse it.

## ARGUMENT

### I.    A Narrow Standard of Review Governs This Action

Jurisdiction in this action is based on 42 U.S.C. 1395oo(f)(1), which provides for judicial review of final Medicare provider reimbursement decisions under the terms of the Administrative Procedure Act ("APA"), 5 U.S.C. 701 *et. seq. Marymount Hosp., Inc. v. Shalala,* 19 F.3d 658, 661 (D.C. Cir. 1994). Pursuant to the APA, the Administrator's decision may therefore be set aside only if it was "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law," or "unsupported by substantial evidence . . . reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413-15 (1971); *Marymount Hosp.* 19 F.3d at 661.

The arbitrary and capricious standard is "highly deferential" to agency decisionmaking and "presumes the validity of agency action." *Nat'l Mining Ass'n v. Mine Safety and Health Admin.,* 116 F.3d 520, 536 (D.C. Cir. 1997) (internal citation omitted). Under the arbitrary and capricious standard, a court is to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Mich. Consol. Gas Co. v. FERC*, 883 F.2d 117, 120 (D.C. Cir. 1989) (citing *Motor Vehicle Mfrs. Ass'n, Inc. v. State*

10

*Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)) (internal citation omitted); *see also Marsh v. Or. Natural Resources Council,* 490 U.S. 360 (1989); *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416. As part of this task, a court must determine whether "the agency . . . articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)). The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43 (1983); *see also Citizens to Preserve Overton Park,* 401 U.S. at 416; *Chadmoore Communications, Inc. v. FCC,* 113 F.3d 235, 241 (D.C. Cir. 1997).

In determining whether an agency decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the court reviews the administrative record as it stood when the agency acted, not extra-record material produced later in court. *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743-44 (1985); *Camp v. Pitts,* 411 U.S. 138, 142 (1973). An agency's interpretation of an ambiguous statute that is contained in a substantive rule or that is the product of formal adjudication is entitled to controlling deference so long as it is reasonable. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). Agency interpretations of statutes set forth in policy statements or agency manuals are "'entitled to respect,' . . . to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris County,* 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)).

The Secretary's interpretation of his own regulations, on the other hand, is entitled to

11

"substantial deference," and "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414 (1945)); *see also Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 151 (1991) ("Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers"); *Lyng v. Payne,* 476 U.S. 926, 939 (1986) ("agency's construction of its own regulations is entitled to substantial deference"). The court must defer to the Secretary's interpretation of a regulation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ.,* 512 U.S. at 512.

The Secretary has extensive authority to determine the precise parameters of "reasonable cost." 42 U.S.C. § 1395x(v)(1)(A). "It is well established that Congress granted the Secretary broad discretion to develop the 'reasonable cost' concept, subject, of course, to the general standard enunciated in 42 U.S.C. § 12395x(v)(1)(A)." *Richey Manor, Inc. v. Schweiker,* 684 F.2d 130, 134 (D.C. Cir. 1982); *see also Humana, Inc. v. Heckler,* 758 F.2d 696, 699 (D.C. Cir. 1985) (noting that "[i]t is undisputed that Congress, in the statute, granted broad discretion to the Secretary to develop the 'reasonable cost' concept through regulations."); *Med. Rehabilitation Servs., P.C. v. Shalala,* 17 F.3d 828, 830 (6th Cir. 1994) (noting that the Secretary prescribes methods for determining a provider's "reasonable cost" in regulations, guidelines, letters, and the Provider Reimbursement Manual).

The substantial weight and deference normally owed agency action reviewable under the APA is particularly appropriate where, as here, the Secretary has interpreted and applied the Medicare statute. The regulations duly promulgated under his interpretation of "reasonable costs" are thus entitled to "considerable deference." *Sun Towers, Inc. v. Heckler,* 725 F.2d 315, 325 (5th Cir. 1984) (internal citation omitted); *see also Butler County Mem. Hosp. v. Heckler,* 780 F.2d 352, 356 (3rd Cir. 1985) (inasmuch as "Congress described only sparsely the means of assessing reasonable costs owed to Medicare providers, and instead assigned the primary responsibility for such assessments to the Secretary," the courts must be cautious lest [they] disturb this appropriate allocation of governmental functions.")

Finally, it must be emphasized that the substantial weight and deference to be accorded the Secretary's final decision on the Plaintiff's Medicare reimbursement claims is not diminished at all by the interim contrary decision of the Board. As the United States Court of Appeals for the Fifth Circuit explained:

> Under 42 U.S.C. § 1395oo(f) and 42 C.F.R. § 405.1875, the Secretary, on [his] own motion and at [his] discretion, may review a decision of the PRRB and on review has all the powers [he] would have if making the initial determination. 5 U.S.C. § 557(b). *Thus, the decision of the PRRB carries no more weight on review by the Secretary than any other interim decision* made along the way in an agency where the ultimate decision of the agency is controlling. *The argument that the court should recognizes the expertise of the members of the PRRB must be met with the assumption that those persons within the agency who assisted the Secretary in a contrary decision must be regarded as equally expert.*

*Homan v. Crimen, Inc. v. Harris,* 626 F.2d 1201, 1205 (5th Cir. 1980) (emphasis added); *see also St. Francis Hosp. Ctr. v. Heckler,* 714 F.2d 872, 874 (7th Cir. 1983). Applying these standards to the facts of this case, the Court should affirm the Secretary's decision.

13

II.     **Reimbursement for Medicare Bad Debt Can Be Made Only Where Providers Have**
        **Met the Requirements of the Program Rules**

Plaintiff begins its attack on the Secretary's decision by contending that the Medicare

program "arbitrarily and capriciously refused to honor its obligation to reimburse such costs on

the sole grounds that BRMC did not perform an 'asset test' to establish that the patients at issue

were indigent and thereby not subject to the harassment of futile 'reasonable collection efforts.'"

Pl. Mot. Summ. J. at 1. At the outset, the Defendant points out that characterizing "reasonable

collection efforts" as "harassment" is both contradictory and distorting. Further, it defies

common sense to imagine applying the term "indigent" without actual consideration of an

individual's assets, and even less tenable is claiming Medicare funds for an "indigent

beneficiary" without providing some documentation in support of this indigency. In simple

terms, before disbursing public funds from the Medicare trust, providers must always comply

with the Secretary's rules and regulations that govern participation in the Medicare program.

Here, that means complying with the Secretary's bad debt rules which, as shown below, plaintiff

failed to do.

In Medicare, the Secretary is charged with administering perhaps the largest healthcare

program in the world. The Medicare statute affords the Secretary broad rulemaking authority in

carrying out his responsibilities and explicitly provides that "[t]he Secretary shall prescribe such

regulations as may be necessary to carry out the administration of the insurance programs under

this title [42 U.S.C. §§ 1395 *et. seq.*]" 42 U.S.C. § 1395hh(a)(1). The Secretary is prohibited

from making payments "to any provider unless [the provider] has furnished such information as

the Secretary may request in order to determine the amounts due such provider . . ." 42 U.S.C.

14

§ 1395g(a).  In order to effect this provision, the Secretary requires that providers like BRMC

submit cost reports on an annual basis in order to "furnish such information to the intermediary

as may be necessary" to "[a]ssure proper payment by the program."  42 C.F.R. § 413.20(d)(1)(I).

This includes *all* "cost revenue, statistical, and other information pertinent to reimbursement."

42 C.F.R. § 413.20(c)(2).  The cost reporting documentation requirements apply to all aspects of

Medicare reimbursement.[9]  Morever, the statute also requires that the Secretary's regulations

ensure that provider reimbursement be related to beneficiary care, so that the "necessary costs of

efficiently delivering covered services to [Medicare beneficiaries] . . . will not be borne by

individuals not so covered, and the costs with respect to individuals not so covered will not be

borne by [the Medicare program.]"  42 U.S.C. § 1395x(v)((1)(A)(i).  In accordance with this

statutory mandate, and consistent with normal accounting practices, the Secretary promulgated

regulations establishing "principles of reasonable cost reimbursement."  42 C.F.R. Pt. 413

(1992).

    The Secretary's Medicare regulations generally treat bad debts as reductions in revenue,

rather than as allowable costs.  42 C.F.R. § 413.89(a), (c).  The Medicare regulations, however,

do allow a hospital to claim reimbursement for unpaid deductible and coinsurance amounts from

covered services furnished to Medicare beneficiaries to prevent the shifting of the uncollected

costs of Medicare services represented by the deductible and coinsurance to non-Medicare

program beneficiaries.  See *id.* at 413.89(d).  In order to assure that the exception for uncollected

---

    [9] For example, providers are required to submit cost reports on an annual basis and to
support its claim for costs with verifiable, auditable documentation sufficient for the intermediary
to determine what payments are due. *See e.g.*, 42 C.F.R. §§ 413.20, 413.24.

deductible and coinsurance amounts does not result in an incentive for hospitals to simply

declare such uncollected amounts to be "bad debts," the regulations require that a hospital

demonstrate that "reasonable collection efforts" were made, that unpaid deductibles and

coinsurance amounts were "actually uncollectible," and that "[s]ound business judgment

established that there was no likelihood of recovery at any time in the near future." 42 C.F.R.

§ 413.89(e).

      Consistent with section 42 C.F.R. 413.89(e)(2), the Medicare Provider Reimbursement

Manual ("PRM") provides further guidance with respect to the payment of bad debts. Section

310 of the PRM provides the general criteria for meeting "reasonable collection efforts" to

collect Medicare deductible and coinsurance amounts. *See supra* at p. 7. In the context of

indigent Medicare beneficiaries, section 312 of the PRM sets forth the criteria necessary to meet

the "reasonable collection efforts" requirement of the regulations, including the requirement at

issue here that the provider perform an asset test. *See supra* at p. 7-8. Like the requirements of

the regulations, these manual criteria seek to prevent providers from simply declaring Medicare

patients to be indigent in order to claim reimbursement for unpaid deductible and coinsurance

amounts. Since satisfying the provisions of PRM § 312 constitutes the "reasonable collection

efforts" requirement of 42 C.F.R. § 413.89(e), the Secretary necessarily has the authority to

establish the steps that must be followed by providers to qualify for this limited exception, and to

require strict adherence to his policy.

## III.   The Requirements in PRM § 312, Including the Asset Test, Are Mandatory

      There are no loopholes in the Medicare program by which reimbursement is

unconditional or based solely on the provider's claim, and this includes reimbursement claims for

indigent bad debt. As stated earlier, the Medicare statute prohibits shifting the costs of Medicare

services to non-beneficiaries. 42 U.S.C. § 1395x(v)(1)(A)(i). The Secretary's regulations,

consistent with the Act, provide that "the costs attributable to deductible and coinsurance

amounts that remain unpaid [by Medicare beneficiaries] are added to the Medicare share of the

allowable costs." 42 C.F.R. § 413.89(d). Congress did not require that the Secretary provide for

an "indigency exception" in establishing rules governing bad debt reimbursement, and the

regulations themselves do not do so. Contrary to plaintiff's belief, a provider's mere *suspicion* of

indigency does not create an opportunity to exploit a Medicare loophole for *carte blanche*

reimbursement.

Instead, the limited exception created by § 312 allows providers to forego debt collection

from indigent beneficiaries *only once indigence is determined,* and this determination requires an

analysis of the patient's total assets. According to PRM § 312:

A.    The patient's indigence must be determined by the provider, not by the
      patient; i.e., a patient's signed declaration of his inability to pay his
      medical bills cannot be considered proof of indigency;

B.    The provider should take into account a patient's total resources which
      would include, but are not limited to, an analysis of assets (only those
      convertible to cash, and unnecessary for the patient's daily living),
      liabilities, and income and expenses . . .

C.    The provider must determine that no source other than the patient would
      be legally responsible for the patient's medical bill . . .; and

D.    The patient's file should contain documentation of the method by which
      indigence was determined in addition to all backup information to
      substantiate the determination.

*Once indigence is determined* and the provider concludes that there has been no
improvement in the beneficiary's financial condition, the debt may be deemed
uncollectible without applying the § 310 procedures . . . .

(Emphasis added). Thus, read in context, the only reasonable interpretation of PRM § 312 is that

all of the provisions of § 312, including the asset test, are mandatory requirements which must

17

precede a provider's claim for reimbursement.

However, in order to escape the responsibility of performing an asset test or documenting one in support of its claim, plaintiff resorts to a dispute over semantics, arguing that "should" does not mean "must." Pl.'s Mot. Summ. J. at 7. The dictionary does not support plaintiff's position.[10] "Should" is merely the past tense of "shall," which is widely understood to issue a command.[11] WEBSTER'S NEW RIVERSIDE UNIVERSITY DICTIONARY 1070-71, 1078 (1994). The very first definition of "should" is that it is used to express "obligation." *Id.* at 1078. To be sure, another definition of "should" is that it is used "to express conditionality or contingency." *Id.* But even that definition supports the Secretary's reading here: if the provider intends to claim indigency for a particular beneficiary it has served, it "should" perform an asset test and ensure that the patient's file contains documentation of the results of that test.

Additionally, plaintiff cites to *St. Paul-Ramsey Med. Ctr. v. Shalala,* Civ. No. 4-92-566, 1993 WL 7672333 (D. Minn. Dec. 2, 1993), *aff'd*, 50 F.3d 522 (8th Cir. 1995) ("*St. Paul-Ramsey*") in support of its argument. Pl.'s Mot. Summ. J. at 7. But *St. Paul-Ramsey* is at most a tantalizing red-herring, and Plaintiff's argument fails. Unlike the plaintiffs presently before this court, there was no dispute that the plaintiffs in *St. Paul-Ramsey* had properly complied with *all* of the requirements of PRM § 312. *St. Paul-Ramsey*, 50 F.3d at 529 ("Thus, we conclude that Ramsey has satisfied all of the relevant requirements of section 312."). Instead, the issue in *St.*

---

[10] The Administrator found that "within the context of [42 C.F.R. 413.80(e)] and the PRM, 'should' is synonymous with 'must.'" A.R. at 9, n.3 (citing THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE AND ROGETS INT'L THESAURUS (citations omitted)).

[11] Should is also defined as the "past tense of shall . . . ordinarily implying duty or obligation . . . [i]t is not normally synonymous with 'may'[.]" BLACK'S LAW DICTIONARY 1549 (Revised 4th ed. 1968).

18

*Paul-Ramsey* was whether PRM § 312 implied a subsequent, *additional* obligation that the provider independently verify the information provided pursuant to PRM § 312. The Eighth Circuit rejected the existence of such an additional, implied obligation. *Id.* at 5. In fact, the Court addressed the asset test directly, stating:

> The Secretary's rule . . . totally lacks any language from which a *separate* verification requirement can be implied. Here it is clear that Ramsey did everything it was *required* to do by subsection B of § 312 as it is written. It took into account each Medicare patient's total assets, liabilities, and income and expense using the factual information that the patient had provided. *What it did not do is what § 312 does not require to be done – independently verify the information provided by the patient.*

*Id.* at 528-29 (emphasis added). In the present case, the plaintiff obviously has not satisfied all the "requirements" of PRM § 312, as a failure to document an asset test is the very crux of this litigation. Indeed, plaintiff goes so far as to argue that PRM § 312 presents no requirements whatsoever. Pl.'s Mot. Summ. J. at 12. Consequently, the matter of subsequent, independent verification addressed in *St. Paul-Ramsey* offers no comfort to plaintiff, and in fact directly contradicts plaintiff's claim that PRM § 312 does not set forth requirements for deeming a Medicare patient indigent.

 *St. Paul-Ramsey* also subverts plaintiff's heavy reliance on a District Court holding in the case of *Harris County Hospital District v. Shalala*, 863 F. Supp. 404 (S.D. Tex. 1994) ("*Harris County*")[12]. Refusing to cite even a standard dictionary definition of the term "should," the *Harris County* court determined that "*[s]hould* is mandatory only when used as the past tense of

---

[12] The defendant notes that the District Court's decision was affirmed by the Fifth Circuit Court of Appeals on grounds other than the definition of "should" and "must." *See Harris County Hosp. Dist. v. Shalala*, 64 F.3d 220 (5th Cir. 1995).

*shall*. Otherwise, should is precatory." *Id.* at 410 (emphasis original).[13] However, less than a

year after the *Harris County* decision, the *St. Paul-Ramsey* Court properly ignored that holding

and effectively acknowledged that "should" does mean "must" here. Unmistakably then, *St.

Paul-Ramsey* upends plaintiff's conviction that, "'should' does not mean 'must.'" Pl.'s Mot.

Summ. J. at 7. The *St. Paul-Ramsey* court neglected to even acknowledge the possibility that

"should" and "must" connote different degrees of instruction. The court simply accounted for

the plaintiff's success in meeting the *requirements* of section 312 and repeatedly acknowledged

that section 312 contains four separate requirements, all of which were properly satisfied by the

plaintiffs, and none of which were disparaged as "precatory" or mere suggestions. *See e.g., St.

Paul-Ramsey* at 528-29.

Finally, there can be no question that the Secretary has consistently held the view that

documentation of an asset test is mandatory under PRM § 312. *See Harris County Hosp. Dist. v.

Blue Cross and Blue Shield Ass'n/Blue Cross and Blue Shield of Tex.,* PRRB Dec. 93-D 103

(Case No. 90-1159, Sept. 29, 1993), reversed by HCFA[14] Administrator (Nov. 23, 1993). *See

also Parkland Mem. Hosp. v. Blue Cross and Blue Shield Ass'n/Blue Cross and Blue Shield of

Tex.,* PRRB Dec. 93-D106 (Case No. D-1410, Sept. 30, 1993), reversed by HCFA Administrator

(Nov. 29, 1993). And, in spite of the fact that the District Court in *Harris County* reversed the

---

[13] Defendant respectfully submits that the District Court in *Harris County* erred in its
analysis. By refusing to offer a single citation to support its own definition of the term "should,"
and in light of the fact that most sources available do not support such a definition, the court's
decision in *Harris County* was understandably not addressed in *St. Paul-Ramsey. See supra,*
n.10-11.

[14] The Centers for Medicare & Medicaid Services (CMS) was previously known as the
Health Care Financing Administration (HCFA).

decision of the Administrator, the Administrator nevertheless continued to maintain that an asset

test was mandatory even thereafter. *See Univ. of Tex. Health Ctr. v. Blue Cross and Blue Shield*

*Ass'n/Blue Cross and Blue Shield of Tex.*, PRRB Dec. 96-D8 (Case No. 89-1917, Jan. 30, 1996),

reversed by HCFA Administrator (April 1, 1996).

Even plaintiff *agrees* that the Secretary has consistently held that an asset test is

mandatory under PRM § 312:

> We [] acknowledge the Administrator's historical position on this issue – that an
> asset test is mandatory under PRM-I § 312 – but also note that CMS's position on
> bad debts has evolved in recent years and that the [Administrator's decision in this
> case] need not cling to positions the Administrator may have assumed in the past.

A.R. at 4, 12-13. The Secretary's consistently held view, ratified by the Eighth Circuit in *St.*

*Paul-Ramsey*, is at least consistent with the text of PRM § 312. As a result, this Court must defer

to the Secretary's construction. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512

(1994).

## IV.  Substantial Evidence Supports the Secretary's Conclusion that Plaintiff Did Not Perform an Adequate Asset Test

As noted above, the Secretary has interpreted the "reasonable collection effort"

requirement to be relaxed in cases of indigency. However, lest the Secretary jeopardize the

integrity of the Medicare program, he reasonably requires providers to undertake an indigency

determination in a meaningful way, and this includes the performance and documentation of an

asset test. The Secretary's determinations that plaintiff made no good-faith attempt to perform

such a test is well-documented in the record. In fact, the record reflects scant, if any, evidence

that plaintiff endeavored to ascertain indigent status on any level, whether enumerated in PRM

§ 312 or not.

By contrast, the plaintiff weakly claims it identified indigent patients through a haphazard and arbitrary process of using a "financial aid worksheet," or an "assistance qualification sheet."[15] A.R. at 61. These two forms were, according to the testimony of plaintiff's Revenue Cycle Coordinator, Mr. Keith Capps, "like an up front screening form" for "talking to a patient before they've had a service to determine if they're going to meet some qualification. Those were *not* a requirement for after the service for a balance owed." *Id.* (emphasis added). It goes without saying that a worksheet "like an up front screening form" is hardly relevant to an indigency determination for bad debt purposes. No debt has even come into existence during the screening process because no services have been rendered, and it was reasonable for the Secretary to find that such worksheets do not qualify as documentation to substantiate an indigency determination pursuant to PRM § 312. Furthermore, Mr. Capps testifed in the following exchange:

> Q.    You also indicated that credit counselors were exercising some independent judgment in deciding . . . who they believed on the telephone, who they wanted more information from [regarding income] . . . Was there any guidance given to the collection agents on how to do that?
>
> A.    *Probably no written guidance. Just if they're talking to someone on the phone and depending on what they're telling you, how they're telling you, you know, whether they believe that was the truth or not.*

A.R. at 60 (emphasis added). Without even reaching the asset test requirement, it is clear that plaintiff's "collection efforts" fall far short of "reasonable," even in effectuating an "income test." The plaintiff thus failed to make an indigency determination because it failed to meet the

---

[15] Plaintiff did utilize a "financial disclosure form" for accounts over $800, and this form included a self-reporting asset disclosure section. *See* A.R. at 398. In many cases, these forms were incomplete. However, the accounts in excess of $800 are not in issue here, and thus this Court need only concern itself with the "financial aid worksheet" and the "assistance qualification sheet."

requirements of PRM § 312; namely, the plaintiff failed to provide satisfactory evidence that it had performed the required asset test.

In effect, plaintiff seeks to replace the judgment of the Secretary with the listening skills of credit counselors in distributing funds from the Medicare trust for the payment of Medicare bad debt. Income test notwithstanding, it is obvious that no asset test, documentation, or listening skill was applied to satisfy this requirement. Since the plaintiff all but ignored the requirements of PRM § 312, it failed to properly make an indigency determination, and its claims for Medicare bad debt reimbursement were properly denied.

**V.     Whether Or Not A Provider Has Flexibility to Set General Indigency and Collection Policies Is Irrelevant to the Issue of Whether It Meets the Requirements for Medicare Bad Debt Reimbursement**

Plaintiff contends at length that certain language taken from two HHS guidance documents undercuts the Secretary's decision here because it allegedly shows that hospitals have flexibility in establishing their own indigency and collection policies. Pl.'s Mot. Summ. J. at 9-12; *see generally* A.R.at 161-169. In fact, those same guidance documents, in *relevant* part, unequivocally refer providers to follow the PRM for instruction on claiming Medicare bad debt reimbursement:

> Q11: Does CMS have any requirements as to what documentation a hospital must secure in order to make an indigency determination? If so, what are those requirements?

> A11: For indigent patients who are not Medicare patients, the Medicare program does not prescribe any specific rules for providers to make indigence determinations[.] *For Medicare patients, however, if a provider wants to claim Medicare bad debt reimbursement, CMS does require documentation to support the indigency determination. To claim Medicare bad debt reimbursement, the provider must follow the guidance stated in the [PRM].*

23

A.R. at 167 (emphasis added). This passage underscores the critical difference between a provider's freedom to design its own indigency policy and the requirements under the Medicare program.

Without a doubt, the parties are not in dispute over the issue of a provider's general autonomy to craft its own indigency and collection policies. *See e.g.*, Ans. ¶ 14. The issue here is whether the policies plaintiff has put in place meet the requirements for Medicare bad debt reimbursement; specifically, whether the plaintiff has performed an asset test under PRM § 312. Obviously, hospitals must enjoy autonomy to exercise their business judgment and conduct their own affairs. And indeed, they may design any charity care or collection policies they see fit. But they cannot expect Medicare to reimburse them for bad debts if the policy they have devised for their own purposes does not comply with program requirements. The defendant thus does not disagree that plaintiff enjoys such flexibility to establish its own manner of collection and determination of indigency, (Pl.'s Mot. Summ. J. at 10-11; Ans. ¶ 14), that a hospital can "determine its own indigency policy" provided that it "[applies] the criteria to Medicare and non-Medicare patients uniformly" *(Id.)*,[16] that "hospitals are free to write their own collection policies" provided that "whatever decision the hospital makes, it must be consistently applied if the hospital wishes to seek Medicare reimbursement for Medicare bad debts" (Pl.'s Mot. Summ.

---

[16] *See also Mt. Sinai Hosp. Med. Ctr v. Shalala,* 196 F.3d 703, 708-09 (7th Cir.1999) (the requirement that Medicare and non-Medicare accounts be treated the same "prevents cost shifting and gives providers the flexibility to determine their own collection policies, *while at the same time ensuring that providers are as diligent in their collection efforts when government money is involved as when their own is at stake.*" (citation omitted) (emphasis added)).

24

J. at 11).[17] But simply designing procedures that it applies uniformly to Medicare and non-Medicare patients is not sufficient to ensure that a provider's claim for bad debt payment will be accepted: those procedures must also comply with the program's bad debt requirements, including the asset test requirement in the case of indigent patients. The Secretary denied plaintiff's claim not because plaintiff had designed its own indigency policy, but rather because that policy failed to meet the program's reasonable and duly promulgated criteria.

It is well settled that while the provisions of the PRM are interpretive rules that do not have the force and effect of law, they advise the public of the agency's construction of the governing statutes and regulations, and as such the agency may apply them in determining claims for reimbursement as long as they do not conflict with the regulations. *See Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99, 101-02 (1995). Section 312 of the PRM, at issue here, is consistent with the bad debt regulations and with the other guidance documents plaintiff relies on. It was entirely proper "for the Secretary to apply that policy here to deny [plaintiff's] claim for full reimbursement." *Id.* at 101-02, Moreover, plaintiff's attempted reliance on "advisory" or "guidance" documents is diminished by its own inconsistent argument that "none of the four criteria in PRM § 312 are required, as § 312 refers to all four criteria as 'guidelines.'" Pl. Mot. Summ. J. at 12. By disparaging the PRM as a "mere agency statement" and not "enforceable law," *id.* at 13, plaintiff necessarily also relegates the importance of the HHS guidance documents it relies on. Plaintiff cannot credibly pick and choose which of these "mere agency statements" it would like to recognize as authoritative.

---

[17] Defendant submits that these statements serve to clarify the application of PRM § 310, not PRM § 312. And in any event, these excerpts add little in the way of clarification.

## CONCLUSION

For the foregoing reasons, the Secretary's respectfully requests that the Court grant his motion for summary judgment, deny plaintiff's motion for summary judgment, and dismiss Plaintiff's complaint with prejudice.

Respectfully Submitted,

Counsel for Defendant:

/s/
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

/s/
JEREMY S. SIMON
Assistant United States Attorney
D.C. Bar No. 447956
Judiciary Center Building
555 4th St., N.W.
Washington, D.C. 20530
(202) 307-0406 (phone)
(202) 514-8780 (fax)

/s/
ANDREW S.M. TSUI
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
Room C2-02-24
7500 Security Boulevard
Baltimore, Maryland 21244-1850
(410) 786-1895

OF COUNSEL:

DAVID S. CADE
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
  Counsel for Litigation
United States Department of
Health and Human Services

27