# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
BAPTIST HEALTHCARE SYSTEM       *
d/b/a BAPTIST REGIONAL          *
MEDICAL CENTER,                 *
                                *
          Plaintiff,            *
                                *
     v.                         *     Civil Action No.: AW-08-0677
                                *
KATHLEEN SEBELIUS,              *
SECRETARY OF HEALTH AND         *
HUMAN SERVICES[1]               *
                                *
```
***********************************************************************

## MEMORANDUM OPINION

Baptist Regional Medical Center ("Plaintiff" or "BRMC") brought this action seeking judicial review of a decision of the Secretary of the United States Department of Health and Human Services ("Defendant" or "Secretary").  Currently pending is BMRC's Motion for Summary Judgment (Paper No. 13) and the Secretary's Cross Motion for Summary Judgment (Paper No. 18). The Court held a hearing on the pending Motions on August 7, 2009. The Court has reviewed the entire record, as well as the Pleadings and Exhibits, with respect to the instant motions.  The issues having been fully briefed by the parties and argued by the parties, this matter is now ripe for review.  For the reasons set forth below, the Court will grant BRMC's Motion for Summary Judgment.

---

[1] On April 28, 2009, Kathleen Sebelius became the Secretary of the United States Department of Health and Human Services, and therefore is substituted for the former Secretary, Michael O. Leavitt, as the Defendant in this action. Fed. R. Civ. P. 25(d).

**Factual and Procedural Background**

Plaintiff, Baptist Healthcare System ("BHS") is a not-for-profit organization that operates an acute care hospital, Baptist Regional Medical Center,("BRMC")in Louisville, KY. BRMC is a provider under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et* seq., and the services rendered by BRMC are certified under the Medicare Program.[2] For the cost reporting years at issue, September 1, 1998 through August 31, 2001, as a part of the BRMC's collection and write-off policy to determine indigence, BRMC required that patients with "debts greater than $800 . . . complete a financial disclosure[3] form that included inquiries for both income and assets," i.e. an "asset test," while patients with debts less than $800 did not. (Compl. ¶ 15 and A.R. at 60.) Patients with a balance under $800 were asked only about their income. (A.R. at 60.) In addition, BRMC determined that some of its patients were "indigent" through an upfront screening process. (A.R. at 61.) Patients completed an "assistance qualification sheet" or a "financial aid worksheet" prior to admission for services, "to determine if [they were] going to meet some qualification." (*Id.*) BRMC also considered whether a patient resided in a certain "catchment area," as a factor to determine indigence. (*Id.*) For example, when dealing with patients who lived in "Whitley County," a high poverty

---

[2]   BRMC primarily offers inpatient/outpatient, psychiatric and rehabilitation services.
[3]   This form serves as a so-called "asset test" as described in paragraph B of the Provider Reimbursement Manual 15-I § 312.  Although the term "asset test" does not appear in the HHS regulations or manual, this terminology is used by both Plaintiff and Defendant, and thus the Court will adhere to its use as well.

county, BRMC credit counselors did not ask many questions about the patient's assets. *(Id.)* This policy "applied equally to Medicare and non-Medicare patients." (Compl. ¶ 14.)

Annually, hospitals must file "cost reports" to their designated fiscal intermediary,[4] that detail the costs attributed to the care of Medicare patients.  42 C.F.R. § 413.20(b). The fiscal intermediary reviews and audits the cost reports, and will disallow any costs it deems inappropriate.  The intermediary issues a Notice of Amount of Program Reimbursement ("NPR") that indicates the providers expected reimbursement, and the basis for the calculation.  For the cost reporting years, 1999, 2000 and 2001 the intermediary disallowed all of BRMC's "bad debt" claims, when the records did not demonstrate that BRMC conducted an asset test as a part of their indigence determination. (A.R. at 3.) The intermediary concluded that "Section 312 of the PRM requires that, in making a determination of indigence, the Provider should take into account the patients total resources, including assets, liabilities and income." *(Id.)*

BRMC timely appealed the intermediary's determination to the Provider Reimbursement Review Board ("Board"). 42 U.S.C. § 1395oo(a); A.R. at 3.) The Board's review focused on "whether the asset test guideline at CMS Pub.15-1, Section 312(B) of the [PRM] must be applied to determine a Medicare beneficiary's indigence. After an in-depth examination of Section 312, the Board concluded that Section 312 "does

---

[4] A fiscal intermediary is a contractor, hired by the federal government to process hospital claims. 42 U.S.C. § 1395(h). During the time in question, BMRC's intermediary was AdminaStar Federal, Inc. *See* Compl. at 4.

not create a mandatory asset test and found that [BRMC's} bad debts should be reimbursed . . . ." (A.R. at 3.)

Review authority of decisions issued by the Board is invested in the Secretary of the Department of Health and Human Services. The Secretary may, on her own motion, reverse, affirm or modify the Board's decision. 42 U.S.C. § 1395oo(f)(1). The Secretary has delegated her review authority to the Administrator of the Centers for Medicare & Medicaid Services ("CMS"). 42 C.F.R. 405.1875. The Administrator undertook a review of the Board's decision.   The Administrator concluded that,

> contrary to the Board's finding, Section 312 of the PRM does create a mandatory asset test.  It is critical that the provider meet the indigency criteria set forth in § 312 of the PRM in order to take into account all necessary information needed to properly deem any patient indigent and, thus, meet the regulatory requirements that a reasonable collection effort was made and that the debt was uncollectible when claimed as worthless.

(A.R. at 8.)

Moreover, the Administrator noted that the "introduction and paragraphs B and D of [S]ection 312 of the PRM uses 'should' whereas paragraphs A and C use 'must,'" yet found that "within the context of the regulation and the PRM, "should" is synonymous with "must." (*Id.* at 9 n.3.)

BRMC now appeals the Administrator's decision. 42 C.F.R. § 405.1875.

## Standard of Review

The parties have filed cross-motions for summary judgment. Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When parties file cross motions for summary judgment, the court must view each motion in the light most favorable to the non-movant. *Quigley v. Giblin*, 569 F.3d 449, 453 (D.C. Cir. 2009); *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Under the Federal Administrative Procedures Act, a reviewing court "shall hold unlawful and set aside agency action, findings and conclusions found to be, arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A). This standard of review is highly deferential and presumes agency action to be valid. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C.Cir.2008). Under the arbitrary and capricious standard, the scope of review is narrow, and a court should not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An

agency determination is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* An agency decision is an abuse of discretion if it is "based on an erroneous interpretation of the law, on factual findings that are not supported by the substantial evidence or represents and represents an unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. U.S.*, 393 F.3d 1277, 1281 (Fed.Cir.2005). Although the decision of the Department of Health and Human Services ("HHS") is entitled to a presumption of validity, that presumption does not shield the decision from a substantial, "thorough, probing, in-depth review" by the reviewing court as opposed to a rubber stamp. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 41 U.S. 402, 415 (1971).

## *Medicare Regulations and Manuals Overview*

Medicare is a federally funded health insurance program for people age 65 or older, or who meet certain other criteria. Medicare consists of two parts: "Part A [42 U.S.C. § 1395(c)-1395(i)], provides reimbursement for inpatient hospital and related post-hospital, home health and hospice care; and Part B [42 U.S.C. § 1395(j)-1395(w)] is a supplementary voluntary insurance program for hospital outpatient services, physician services and other services not covered under Part A." (A.R. at 5.) "Medicare providers are reimbursed by the Medicare

program through fiscal intermediaries for Part A and carriers for Part B, under contract with the Secretary." At issue in this case is Part A of the Medicare program.

Medicare Part A, reimburses providers for the reasonable and necessary costs incurred to care for Medicare beneficiaries. 42 C.F.R § 413.9(b)(1) defines reasonable costs as those costs, direct and indirect, related to the treatment of Medicare beneficiaries. Utilizing the methods in the regulations for determining reasonable costs, the goal is that costs related to individuals covered by the program not borne by other not covered by the program. *Id.* To this end, Medicare recognizes that,

> the failure of beneficiaries to pay the deductible and coinsurance amounts could result in the related costs of covered services being borne by other than Medicare beneficiaries, [and therefore,] to assure that such covered service costs are not borne by others, the costs attributable to the deductible and coinsurance amounts that remain unpaid are added to the Medicare share of allowable costs.

42 C.F.R. 413.89(d).

Before unpaid deductible and coinsurance balances or "bad debts" are added to a provider's allowable costs, the following criteria must be satisfied,

> (1)   The debt <u>must</u> be related to covered services and derived from deductible and coinsurance amounts.
> (2)   The provider <u>must</u> be able to establish that reasonable collection efforts were made.
> (3)   The debt was actually uncollectible when claimed as worthless.

(4)   Sound business judgment established that there
was no likelihood of recovery at any time in
the future.

42 C.F.R. 413.89(e). (emphasis added)

Due to the complexity of the regulations, however, the Secretary has issued interpretive manuals, guidelines, letters and other publications to help intermediaries and providers better understand the regulations. *See American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C.Cir.1987). One such manual is the CMS Pub. 15-1, also known as the Provider Reimbursement Manual ("PMR"). (Paper 18 at 5.) The provisions of the PRM "do not have the effect of substantive law or regulation, rather they are interpretive rules" that clarify existing law or regulations, and "set practical processes." *Harris County*, 863 F.Supp. at 409 (citing *Mother Frances Hosp. of Tyler, Texas v. Shalala*, 15 F.3d 423 (5th Cir. 1994)). Section 310 and 312 of the PRM set forth guidelines to assist providers in understanding when a bad debt is an allowable cost. As a general starting point, a provider is required to make "reasonable collection efforts" before a bad debt can be considered an allowable cost. Section 310 states:

> To be considered a reasonable collection effort, a provider's effort to collect Medicare deductible and coinsurance amounts <u>must</u> be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients. It must involve the issuance of a bill on or shortly after discharge or death of the beneficiary to the party responsible for the patient's personal financial obligations. It also includes other actions such as subsequent billings, collection letters and telephone calls or personal contacts with this party which constitute a genuine rather than token collection effort.

8

PRM § 310. (emphasis added)

In the case of an indigent patient, however, Section 312 of the PRM dispenses with the reasonable collection efforts and gives providers different guidance.  Section 312 states:

> In some cases, the provider may have established before discharge, or within a reasonable time before the current admission, that the beneficiary is either indigent or medically indigent.  Providers can deem Medicare beneficiaries indigent or medically indigent when such individuals have also been determined eligible for Medicaid as either categorically needy individuals or medically needy individuals, respectively.  <u>Otherwise, the provider **should** apply its **customary methods** for determining indigence of patients</u> to the case of the Medicare beneficiary under the following guidelines:
>
> A. The patient's indigence <u>must</u> be determined by the provider, not by the patient; i.e. a patient's signed declaration of his inability to pay his medical bills cannot be considered proof of indigency;
> B. The provider <u>should</u> take into account a patient's total resources which would include, but are not limited, to an analysis of assets (only those convertible to cash, and unnecessary for the patient's daily living), liabilities and income and expenses. In making this analysis the provider <u>should</u> take into account any extenuating circumstances that would affect the determination of the patient's indigence;
> C. The provider <u>must</u> determine that no source other than the patient would be legally responsible for the patient's medical bill . . .; and
> D. The patient's file <u>should</u> contain documentation of the <u>method</u> by which indigence was determined in addition to all back up information to substantiate the determination.

Once indigence is determined and the provider concludes that there has been no improvement in the beneficiary's

financial condition, the debt may be deemed uncollectible without applying the Section 310 procedures.[5]

CMS regulations and the PRM allow a provider to "waive collection of charges to any patients, Medicare or non-Medicare, including low-income, uninsured or medically indigent individuals, if it is done as part of the [provider's] indigency policy. By 'indigency policy' [the Secretary] mean[s] a policy developed and utilized by the hospital to determine patients' financial ability to pay for services," (A.R. at 164)(quoting a 2004 news release of former Secretary of HHS, Thommie Thompson.) as long as the policy applies to Medicare and non-Medicare patients uniformly. (A.R. 166-67.)

At issue in this case is the application of paragraph B of Section 312 of the PRM when a provider seeks reimbursement of bad debts for indigent Medicare beneficiaries.

## Analysis

The Administrator determined that "Section 312 of the PRM does create a mandatory asset test." (A.R. at 8.) He concluded that, the "Provider failed to employ an asset test and did not properly evaluate the indigency status of its patients and thus, the Intermediary properly disallowed the Provider's claimed bad debts." (A.R. at 9.) Thus, the question before the Court is whether a reasonable interpretation of PRM 312 requires that BRMC perform an asset test in

---

[5] *Available at*
*http://www.cms.hhs.gov/Manuals/PBM/itemdetail.asp?filterType=none&filterByDID=-99&sortByDID=1&sortOrder=ascending&itemID=CMS021929 (Chapter 3)*

order to determine whether a Medicare beneficiary is indigent.[6] The Court's determination in this case boils down to the meaning of two simple words — *must* and *should*, and contrary to the Administrator's finding, this Court concludes that the words must and should are not synonymous neither in the context of government regulations and manuals nor in everyday usage.

The Administrator acknowledged that the appearance of the auxiliary verbs, must and should, alternated from paragraph to paragraph in Section 312, (A.R. at 7-8.) yet she found that pursuant to Medicare regulations and the PRM, providers are required to follow certain procedures in making indigency determinations, . . . [and that a] provider's strict compliance with these procedures flows from the plain, <u>mandatory</u> language of [all of] Section 312 . . . ." (A.R. at 9.)(emphasis added)  The Administrator rejected the court's finding in *Harris County* that the word "should" is synonymous with must, but offered no case law or other legal precedent to support his findings. (A.R. at 9 n.3) The Administrator simply concluded that BRMC's policy "constitute[d] insufficient and improper collection efforts." (A.R. at 10.)

The Administrator's conclusions stand in stark contrast to the Agency's unequivocal statement that, a hospital may determine its own individual indigency criteria. (*Id.*) When the Court examines Section 312 in the context of this unequivocal statement, however, it becomes

---

[6] Defendant mischaracterized the issue for the Court as whether Plaintiff performed an asset test. (Paper 18 at 9)

clear paragraph B, as well as paragraph D are best construed as strong, but noncompulsory recommendations.

Starting from the premise that providers may determine their own individual indigency criteria,[7] Section 312 makes sense.  The Section begins by setting forth the primary ways a provider may classify a beneficiary as indigent. Section 312 then states, "[o]therwise the provider should apply its customary methods for determining indigence of patients . . . ." PRM Section 312. The Court presumes that by "customary methods" the PRM is referring to the individual indigency criterion that providers are allowed to create. Section 312 then sets forth guidelines for how those customary methods should be applied to Medicare beneficiaries.

Paragraph A states: "the patient's indigence must be determined by the provider, not by the patient;. . . ." PRM Section 312(A). No one disputes that the word must connotes an obligation, and thus it follows that the drafters of Section 312 used the word must in paragraph A because they wanted to ensure that providers, in creating their own indigency criteria, did not leave the determination up to the patient, and thus render Section 312 impotent.  But it also follows that the drafters used the word "should" in paragraph B.

Paragraph B states: "the provider should take into account a patient's total resources which would include, but are not limited, to

---

[7] The parties agree that a provider is allowed to determine its own indigency policy as long as the criteria are applied consistently to Medicare and non-Medicare patients.  (A.R. 166-67) It is undisputed that BRMC's indigency policy applied consistently to Medicare and non-Medicare patients.

an analysis of assets . . . , liabilities and income and expenses. In making this analysis the provider <u>should</u> take into account any extenuating circumstances . . . ." PRM Section 312(B)(emphasis added). The drafters used the word should not once, but twice, and the Court finds that they used the word *should* as a suggestion of the ideal criteria a provider could use.  The drafters did not use the word *must* because had they done so, they would have effectively dictated to providers exactly how they had to structure their indigence criteria, which would contradict the initial premise. Likewise it makes sense that the drafters chose to use word *should* in second sentence of paragraph B to express a strong suggestion that providers take into account a patients extenuating circumstances. For the same reasons, the use of the word *must* in paragraph C and *should* in paragraph D is logical as well.

With respect to paragraph C, were the provider able to bill Medicare for a bad debt that someone else other than the patient was legally required to pay, it would create a gaping loophole in the indigence determination. Hence, the use of the unequivocal auxiliary verb *must*. The Court finds paragraph D particularly instructive, not only on the issue of whether *must* and *should* are synonymous, but also on the asset test on the whole.  Paragraph D states: "<u>The patient's file should</u> contain documentation of the <u>method</u> by which indigence was determined in addition to all back up information to substantiate the determination."   PRM Section 312(D)(emphasis added). During the hearing, the Defendant pointed to the use of should in this paragraph as proof that the word *should* carries a mandatory connation because no

one can dispute a provider must submit documentation in order to receive reimbursement from Medicare. The Plaintiff countered that while documentation is certainly necessary, the real meaning of paragraph D emanates from the words preceding *should*. Plaintiff argues that in the context of the words, "the patient's file," the word *should* is still precatory and not mandatory, because it explains the ideal location for the documentation. The Court agrees, but also notes that the word *method* indicates that the manual contemplates others ways that a provider can determine a person's indigence, aside from an asset test.

The case law is clear and. Several Courts of Appeals discussing the word should repudiate the notion that it is synonymous with *must*. *See Marshall v. Anaconda Co.*, 586 F.2d 370, 375 (9th Cir. 1979)(stating that the words "should . . . unless" are more advisory than the words "shall . . . unless"); *United States v. Maria*, 186 F.3d 65,70 (2d Cir. 1999)(stating that the common meaning of "should" suggests or recommends a course of action, while the ordinary understanding of "shall" describes a course of action that is mandatory.); *United* States v. Harris, 63 F.3d 555, 559 (2d Cir. 1994)(opining that because the regulation does not say that the court "must" but rather the court "should," it suggests an approach and does not mandate it.) Moreover, the court in *Harris County* squarely dealt with this issue in sum and substance, and here, just as in *Harris County,* the Secretary "goes to heroic efforts to assert that should means must," but offers nothing to refute the plain meaning of the two words, and thus her argument must fail. *Harris* County, 863 F.Supp. at

410. And while the Secretary beseeches this Court that her interpretation of the PRM's language is entitled to substantial deference, the Court finds this interpretation arbitrary because it disregards the purposeful word choice undertaken when drafting regulations and guidelines that have far reaching legal implications. This is especially the case when drafters of such documents toggle between words within a particular provision.

Thus for the reasons cited above, the Court believes that words *must* and *should* do not carry the same meaning in the context of Section 312 of the PRM.

## Conclusion

The Secretary has the discretion to change the language of the PRM so that each paragraph uses the auxiliary verb *must*, but for some reason she has chosen not to. In order to preclude courts from reaching the same conclusion in future decisions, the Secretary should amend Section 312 of the PRM.

| August 18, 2009 | /s/ |
|---|---|
| Date | Judge Alexander Williams, Jr. |
|  | United States District Judge |